**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID SCHWARTZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| HEXCEL CORPORATION, NICK L. STANAGE, JEFFREY C. CAMPBELL, THOMAS A. GENDRON, GUY C. HACHEY, JEFFREY A. GRAVES, CYNTHIA M. EGNOTOVICH, JOEL S. BECKMAN, LYNN BRUBAKER and CATHERINE A. SUEVER, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:20-cv-01975

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff David Schwartz ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Hexcel Corporation ("Hexcel" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Hexcel, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Hexcel and Woodward, Inc. ("Woodward").

2.      On January 12, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive 0.625 shares of Woodward common stock for each share of Hexcel stock they own (the "Merger Consideration"). Upon completion of the merger, Hexcel shareholders will own approximately 45% and Woodward shareholders will own approximately 55% of the common stock outstanding.

3.      On February 28, 2020, in order to convince Hexcel shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form S-4 (the "S-4") Registration Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading S-4 violates SEC Rule 14a-9 (17 C.F.R. § 240.14a-9).

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the S-4, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the S-4 materially incomplete and misleading.

5.      In particular, the S-4 contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Hexcel shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Hexcel' financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the S-4 is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Hexcel shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Hexcel is incorporated in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Hexcel common stock.

12.     Defendant Hexcel is incorporated in Delaware and maintains its principal executive offices at 281 Tresser Boulevard, 16th Floor, Stamford, Connecticut 06901. The Company's

common stock trades on the NYSE under the ticker symbol "HXL."

13.     Individual Defendant Nick L. Stanage is Hexcel's President, Chief Executive Officer and Chairman and has been a director of Hexcel since January 2014.

14.     Individual Defendant Jeffrey C. Campbell is Hexcel's Lead Director and has been a director of Hexcel since November 2003.

15.     Individual Defendant Thomas A. Gendron is Woodward's President, Chief Executive Officer and Chairman and has been a director of Hexcel since January 2011.

16.     Individual Defendant Guy C. Hachey has been a director of Hexcel since October 2014.

17.     Individual Defendant Jeffrey A. Graves has been a director of Hexcel since July 2007.

18.     Individual Defendant Cynthia M. Egnotovich has been a director of Hexcel since January 2015.

19.     Individual Defendant Joel S. Beckman has been a director of Hexcel since March 2003.

20.     Individual Defendant Lynn Brubaker has been a director of Hexcel since December 2005.

21.     Individual Defendant Catherine A. Suever has been a director of Hexcel since May 2018.

22.     The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Hexcel (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

   a.     The Class is so numerous that joinder of all members is impracticable.  As of February 21, 2020, there were approximately 86,000,000 shares of Hexcel common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Hexcel will be ascertained through discovery;

   b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

     i)     whether Defendants disclosed material information that includes non-GAAP (Generally Accepted Accounting Principles) financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

     ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.     The Proposed Transaction

25.     Hexcel is an advanced composite company that develops, manufactures and markets lightweight, high-performance structural materials including carbon fibers, specialty reinforcements, prepregs and other fiber-reinforced matrix materials, honeycomb, adhesives, radio frequency/electromagnetic interference and microwave absorbing materials, engineered honeycomb and composite structures.  The Company's products are used in a wide variety of end applications, such as commercial and military aircraft, space launch vehicles and satellites, wind turbine blades, automotive, recreational products and other industrial applications.

26.     On January 12, 2019, Hexcel and Woodward issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> FORT COLLINS, Colo. & STAMFORD, Conn.--(BUSINESS WIRE)--Woodward, Inc. (NASDAQ: WWD) and Hexcel Corporation (NYSE: HXL) today announced a definitive agreement to combine in an all-stock merger of equals to create a premier integrated systems provider serving the aerospace and industrial sectors. The combined company will focus on technology-rich innovations to deliver smarter, cleaner, and safer customer solutions.
>
> Under the terms of the agreement approved by the Boards of Directors of both companies, Hexcel shareholders will receive a fixed exchange ratio of 0.625 shares of Woodward common stock for each share of Hexcel common stock, and Woodward shareholders will continue to own the same number of shares of common stock in the combined company as they do immediately prior to the closing. The exchange ratio is consistent with the 30-day average share prices of both companies. Upon completion of the merger, existing Woodward shareholders will own approximately 55% and existing Hexcel shareholders will own approximately 45% of the combined company on a fully diluted basis. In connection with the transaction, Woodward is increasing its quarterly cash dividend to $0.28 a share. The merger is expected to be tax free for U.S. federal income tax purposes.
>
> The combined company, to be named Woodward Hexcel, will be among the top independent aerospace and defense suppliers globally by revenue. It will have more than 16,000 employees, manufacturing operations in 14 countries on five continents, and a diversified customer base across multiple markets. For each

company's respective fiscal year 2019 on a pro forma basis, the combined company is expected to generate net revenues of approximately $5.3 billion and EBITDA of $1.1 billion, or a 21% EBITDA margin.

Nick Stanage, Chairman, Chief Executive Officer and President of Hexcel, will serve as Chief Executive Officer of the combined company. Tom Gendron, Chairman, Chief Executive Officer and President of Woodward, will serve as Executive Chairman of the combined company until the first anniversary of the closing of the merger, at which time Mr. Gendron intends to retire from the company and will then serve as non-executive Chairman of the combined company until the second anniversary of the merger close. At that point, Mr. Stanage will assume the role of Chairman of the Board in addition to his CEO responsibilities. The combined company's Board of Directors will have 10 members, consisting of five directors from each company, including Mr. Gendron and Mr. Stanage.

Mr. Gendron said, "Our two companies are each independently working toward addressing the sustainability and efficiency needs of our customers. This merger accelerates our technology investments and creates greater benefits and growth opportunities than either company could have achieved alone. Both Woodward and Hexcel have attractive growth trajectories, with strong aftermarket positions and increased composite penetration driving our respective outlooks. Our complementary cultures and shared commitment to operational excellence and customer satisfaction, together with our enhanced financial strength, will position us to better serve our OEM and aftermarket customers. We will be stronger together and are committed to delivering even greater value to all our stakeholders."

Mr. Stanage said, "The future of flight and energy efficiency will be defined by next-generation platforms delivering lower cost of ownership, reduced emissions, and enhanced safety – and a combined Hexcel and Woodward will be at the forefront of this evolution. Woodward's innovative control systems and Hexcel's advanced lightweight materials are designed to drive improved reliability, efficiency, and emissions. Through our combined scale and strong cash flow profile, we will be even better positioned to accelerate innovation in aerodynamics and propulsion efficiencies and support evolving customer needs. I am incredibly excited about what we can accomplish by uniting these two premier companies and world-class teams with similar values, cultures, and operating philosophies."

Strategic and financial benefits of the merger include:

- **Creates leading company well positioned to deliver forward-looking technologies to address evolving customer needs.** The transaction unites industry leaders in advanced materials and control systems to create a premier aerospace and industrial leader well positioned to satisfy customer demands for aircraft aerodynamics, energy efficiency, improved safety, and reduced emissions and noise. The combined company expects to spend approximately $250 million on research and development in the first full

year post-closing and will have greater resources to invest in emerging technologies to support next-generation aerospace customer programs and accelerate innovation in aerodynamics, propulsion, and energy efficiency.

- **Well-balanced portfolio across customers, end markets, and investment cycles.** Building on each company's strong existing positions on best-in-class product platforms, the combined company will have greater depth and balance of customer relationships across the aerospace and industrial sectors, with significant opportunities for cross-selling and to enhance customer relationships. The transaction combines both companies' exceptional OEM positions, Hexcel's secular composite penetration, and Woodward's industry-leading aftermarket positions to drive consistent top-line growth and cash flow generation across program lifecycles.

- **Significant shareholder value creation opportunities.** The combined company is expected to realize more than $125 million in annual cost synergies by the second full fiscal year post-closing, primarily from strategic sourcing opportunities, elimination of duplicative corporate costs, leveraging its global footprint and infrastructure, and expanding shared service platforms.

- **Strong balance sheet with significant free cash flow generation and a commitment to a balanced capital allocation strategy.** For each company's respective fiscal year 2019, Woodward Hexcel would have more than $5.3 billion of pro forma revenue and over $1.1 billion of EBITDA or 21% EBITDA margin. Combined free cash flow is forecasted to be approximately $1 billion annually and growing. Woodward Hexcel is expected to be capitalized with a strong balance sheet and a leverage ratio of approximately 1.4x debt/trailing EBITDA at closing. The combined company intends to pursue an investment grade rating, a competitive dividend yield with an initial target of 1%, and deploy cash toward acquisitions and share repurchases, including executing on an expected $1.5 billion share repurchase program within 18 months of closing.

- **Complementary cultures and operating philosophies.** Woodward and Hexcel share similar values and strong track records of high-impact R&D investment. By leveraging our team members' talents and a common focus on operational excellence, Woodward Hexcel will continue to bring innovative products to market while driving operating margin improvements. Together, these actions will continue to deliver significant value to shareholders.

**Headquarters and Transition Team**

Woodward Hexcel will be headquartered in Fort Collins, Colorado. The combined company will be led by a highly experienced and proven leadership team that reflects the strengths and capabilities of both organizations. In addition and to

ensure a seamless integration, Woodward and Hexcel will establish a dedicated integration planning team, led by Bob Weber, Vice Chairman of Woodward, and Rob Hennemuth, Executive Vice President of Human Resources and Communications at Hexcel.

**Approvals and Timing to Close**

The transaction is subject to the approval of the shareholders of both Woodward and Hexcel, as well as other customary closing conditions, including required regulatory approvals. The parties expect the merger to close in the third calendar quarter of 2020, subject to satisfaction of these conditions.

**Earnings Releases**

In separate news releases, Woodward and Hexcel will report Q1 2020 and Q4 2019 financial results, respectively, on February 3, 2020, after market close.

**Advisors**

Goldman Sachs & Co. LLC is acting as exclusive financial advisor to Hexcel, and Wachtell, Lipton, Rosen & Katz is serving as legal counsel. J.P. Morgan Securities LLC is acting as exclusive financial advisor to Woodward, and Wilson Sonsini Goodrich & Rosati is serving as legal counsel.

**Joint Conference Call and Transaction Website**

Hexcel Corporation and Woodward, Inc. will conduct a joint live conference call and webcast today (January 12, 2020) at 5:00 p.m. (EST). The event will be webcast and can be accessed on the joint transaction website at www.woodwardhexcelmerger.com and on the investor relations section of each company's website at www.Hexcel.com and www.Woodward.com. The event can also be accessed by dialing +1 (866) 610-1072. The conference ID is 1174138. A replay of the call will be available on the investor relations page of each company's website approximately two hours after the conclusion of the call.

**About Woodward**

Woodward is an independent designer, manufacturer, and service provider of control system solutions and components for the aerospace and industrial markets. The company's innovative fluid, combustion, electrical, and motion control systems help customers offer cleaner, more reliable, and more efficient equipment. Our customers include leading original equipment manufacturers and end users of their products. Woodward is a global company headquartered in Fort Collins, Colorado, USA. Visit our website at www.woodward.com.

**About Hexcel**

Hexcel Corporation is a leading advanced composites company. It develops, manufactures and markets lightweight, high-performance structural materials, including carbon fibers, specialty reinforcements, prepregs and other fiber-reinforced matrix materials, honeycomb, adhesives, engineered core and composite structures, used in commercial aerospace, space and defense and industrial applications. Learn more at www.Hexcel.com.

27.     Hexcel is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the S-4, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading S-4 is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading S-4

29.     On February 28, 2020, Defendants caused the S-4 to be filed with the SEC in connection with the Proposed Transaction.  The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed

decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materially Misleading Sales Process

30.    The S-4 discloses that the first discussions relating to the Proposed Transaction took place on September 18, 2019, when Individual Defendant Nick L. Stanage discussed with Individual Defendant Thomas A. Gendron the potential benefits of a strategic transaction. S-4 53. Over the next roughly four months, the Merger Agreement and all other transactions contemplated by the merger were completed.  *Id.* 53-60.  From the description contained in the *Background of the Merger*, the expedited sales process appears to be flawed and designed to facilitate a transaction with Woodward.

31.    The S-4 does not disclose if Hexcel or Goldman Sachs conducted a market check or even considered a transaction without Woodward. The S-4 has multiple disclosures where Hexcel Board meetings discussed the benefits of a potential strategic combination and logistically what needed to be done to complete the merger, *id.* at 55-57, but there are no mentions of considering any alternative forms of a transaction that would generate a premium for the Company's shareholders or continuing to operate on a stand-alone basis. This information is material because the Company's shareholders are being asked to give up their shares in a company where they have voting power, and to exchange them for a minority stake. In order for the Company's shareholders to determine if they are being fairly compensated for the reduction in voting power, the shareholders need to know if there was potential for other offers that would more highly value the Company or if the Company considered alternate stand-alone strategic business plans that could maximize the value of the Company. Without this information, shareholders cannot be sure that the Merger Consideration represents the fair market value of the Company.

32.     Additionally, the S-4 fails to disclose the timing and the nature of the employment and governance communications between the Company and Woodward. These discussions are material because the Board's interests are divergent from the shareholders in this regard and the content of the communications illustrates to shareholders if the Board was truly negotiating for their benefit.

### The Materiality of Financial Projections

33.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the S-4 discloses that in connection with evaluating a possible transaction with Woodward, Hexcel's management created certain unaudited prospective financial information for fiscal years 2020 through 2024, and projected EBITDA synergies for the next five years following the merger.  *Id.* at 84-87.

34.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

35.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to

assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

36.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

37.     Here, Hexcel shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. S-4 60-63.

38.     As discussed further below, the non-GAAP financial projections used do not provide Hexcel shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

*The Financial Projections Relied on by the Board*

39.     The S-4 discloses that in connection with evaluating a possible transaction with Woodward, Hexcel's management created certain unaudited prospective financial information for fiscal years 2020 through 2024, and projected EBITDA synergies for the next five years following the merger.  *Id.* at 84-87.

40.     The S-4 goes on to disclose, *inter alia*, forecasted values for projected non-GAAP financial metrics for 2020 through 2024 for EBITDA, but fails to provide (i) the line items used to calculate the non-GAAP metric or (ii) a reconciliation of the non-GAAP projections to the most comparable GAAP measure.  *Id.* at 87.

41.     The S-4 does not define EBITDA, reconcile EBITDA to its most comparable GAAP measure or disclose the line items used to calculate EBITDA, rendering the S-4 materially false and/or misleading.  *Id.*

42.     Thus, the S-4's disclosure of non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measure disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

43.     The non-GAAP financial projections disclosed on page 87 of the S-4 violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC

Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

44.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

45.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

46.     Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure and a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

. . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

47.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Hexcel included in the S-4 here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.   And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

---

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

48.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

49.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the S-4 into compliance

---

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.
[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.
[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Mar. 3, 2020).

with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

50.     In addition to the S-4's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

51.     Such projections are necessary to make the non-GAAP projections included in the S-4 not misleading for the reasons discussed above.

52.     Furthermore, the failure to even provide a definition for EBITDA is particularly misleading because non-GAAP financials have non-standard definitions.  The failure to provide a definition means shareholders cannot be sure this version of EBITDA is comparable to the Company's previous filings, Woodward or other competitors.

53.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

54.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 87, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

55.     The summary of the valuation methodologies utilized by Goldman Sachs, including the utilization of certain of the non-GAAP financial projections described above by Goldman Sachs, in connection with its valuation analyses (*id.* at 65) is misleading in violation of Regulation

14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once an S-4 discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.     With respect to Goldman Sachs's *Illustrative Present Value of Future Share Price Analysis – Hexcel Standalone*, the S-4 discloses that Goldman Sachs performed an illustrative analysis of the implied present values of illustrative future values per share of Hexcel common stock on a stand-alone basis by calculating a range of future share prices, excluding dividends, for Hexcel as of December 31 for each of the years 2020 to 2022 by applying a range of next twelve months price to earnings multiples of 19.0x to 21.0x to the next twelve month earnings per share estimates for Hexcel, using the Hexcel prospective financial information.  *Id.* at 69.  Goldman Sachs then added the cumulative dividends per share expected to be paid to Hexcel stockholders in each of the years 2020 to 2022, using the Hexcel prospective financial information.  *Id.* Goldman Sachs then discounted the implied future prices per share of Hexcel common stock (including cumulative dividends) back to December 31, 2019, using a discount rate of 7.50% calculated as Hexcel's cost of equity.  *Id.*

57.     The S-4 fails to disclose the Company's earnings per share estimates for years 2020-2022, the cumulative dividends per share expected to be paid to Hexcel shareholders for years 2020-2022, and the inputs used in calculating Hexcel's cost of equity.

58.     With respect to Goldman Sachs's *Illustrative Present Value of Future Share Price Analysis – Woodward Standalone*, the S-4 discloses that Goldman Sachs performed an illustrative analysis of the implied present values of illustrative future values per share of Woodward common stock on a stand-alone basis by calculating a range of future share prices, excluding dividends, for

Woodward as of December 31 for each of the years 2020 to 2022 by applying a range of next twelve months price to earnings multiples of 19.0x to 21.0x to the next twelve month earnings per share estimates for Woodward, using the Woodward prospective financial information. *Id.* at 69-70. Goldman Sachs then added the cumulative dividends per share expected to be paid to Woodward stockholders in each of the years 2020 to 2022, using the Woodward prospective financial information. *Id.* Goldman Sachs then discounted the implied future prices per share of Woodward common stock (including cumulative dividends) back to December 31, 2019, using a discount rate of 8.0% calculated as Woodward's cost of equity. *Id.*

59. The S-4 fails to disclose the Woodward's earnings per share estimates for years 2020-2022, the cumulative dividends per share expected to be paid to Woodward shareholders for years 2020-2022, and the inputs used in calculating Woodward's cost of equity.

60. Goldman Sachs's performed three discounted cash flow analyses, valuing Hexcel, Woodward and the pro forma combined company. With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis – Hexcel Standalone*, the S-4 states Goldman Sachs discounted estimates of unlevered free cash flow for Hexcel for the years 2020 through 2024, as reflected in the Hexcel projected financial information, and a range of terminal values for Hexcel, which were calculated by applying a multiple range of 12.0x to 14.0x to a terminal year estimate of the EBITDA to be generated by Hexcel, as reflected in the Hexcel prospective financial information. *Id.* at 67. Goldman Sachs utilized a discount rate range of 6.5% to 7.5%, calculated as Hexcel's weighted average cost of capital. *Id.* Goldman Sachs calculated a range of enterprise values for Hexcel by adding the ranges of present values, and subtracted the amount of Hexcel's net debt as of December 31, 2019, and amounts attributable to tax-effected pension underfunding and other post-employment benefits as of December 31, 2019, each as provided by Hexcel's management,

and added the amount of capitalized joint venture income, as provided by Hexcel's management, to calculate Hexcel's equity value. *Id.* Goldman Sachs then divided by the fully diluted shares outstanding of Hexcel common stock, as provided by Hexcel's management, to derive the per share value. *Id.*

61.     With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis – Woodward Standalone*, the S-4 states Goldman Sachs discounted estimates of unlevered free cash flow for Woodward for the first nine months of 2020 and for the full calendar years 2021 through 2024, as reflected in the Woodward projected financial information, and a range of terminal values for Woodward, which were calculated by applying a multiple range of 12.0x to 14.0x to a terminal year estimate of the EBITDA to be generated by Woodward, as reflected in the Woodward prospective financial information. *Id.* at 68. Goldman Sachs utilized a discount rate range of 7.0% to 8.0%, calculated as Woodward's weighted average cost of capital. *Id.* Goldman Sachs calculated a range of enterprise values for Woodward by adding the ranges of present values, and subtracted the amount of Woodward's net debt as of December 31, 2019, and amounts attributable to tax-effected pension underfunding and other post-employment benefits as of December 31, 2019, each as provided by Woodward's management and approved by Hexcel, to calculate Woodward's equity value. *Id.* Goldman Sachs then divided by the fully diluted shares outstanding of Woodward common stock, as provided by Woodward's management and approved by Hexcel, to derive the per share value. *Id.*

62.     With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis – Pro Forma Combined Company*, the S-4 states that Goldman Sachs discounted estimates of unlevered free cash flow for the pro forma combined company for the years 2020 through 2023 as reflected in the Hexcel prospective financial information and the Woodward base prospective financial

information, and a range of terminal values for the pro forma combined company, which were calculated by applying a multiple range of 12.0x to 14.0x to a terminal year estimate of EBITDA to be generated by the pro forma combined company taking into account the potential combined company synergies, as reflected in the Hexcel prospective financial information, the Woodward base prospective financial information and the potential combined company synergies. *Id.* at 68-69. Goldman Sachs utilized a discount rate range of 6.5% to 7.5%, calculated as the pro forma combined company's weighted average cost of capital. *Id.* at 68. Goldman Sachs calculated a range of enterprise values for the pro forma combined company by adding the range of present values, subtracted the pro forma combined company estimated pro forma net debt and amounts attributable to tax-effected pension underfunding of the pro forma combined company and other post-employment benefits as of December 31, 2019, and the amount attributable to estimated transaction costs of the pro forma combined company, each as provided by Hexcel's management, and added the amount of capitalized joint venture income, as provided by Hexcel's management, to the pro forma combined company's equity value. *Id.* at 69. Goldman Sachs then divided by the number of fully diluted shares expected to be outstanding for the combined company and calculated the value to be received per share of Hexcel. *Id.*

63.     With respect to Goldman Sachs's discounted cash flow analysis of Hexcel, the S-4 does not define or disclose the forecasted unlevered free cash flows, the calculated range of terminal values, any of the inputs that went into calculating the Company's weighted average cost of capital, how stock based compensation was treated, Hexcel's net debt, the amounts attributable to tax-effected pension underfunding and other post-employment benefits, the amount of capitalized joint venture income or the number of fully diluted shares of Hexcel outstanding.

64.     With respect to Goldman Sachs's discounted cash flow analysis of Woodward, the S-4 does not define or disclose the forecasted unlevered free cash flows, the calculated range of terminal values, any of the inputs that went into calculating the Woodward's weighted average cost of capital, how stock based compensation was treated, Woodward's net debt, the amounts attributable to tax-effected pension underfunding and other post-employment benefits or the number of fully diluted shares of Woodward outstanding.

65.     With respect to Goldman Sachs's discounted cash flow analysis of the pro forma combined company, the S-4 does not define or disclose the forecasted unlevered free cash flows, the calculated range of terminal values, any of the inputs that went into calculating the combined company's weighted average cost of capital, how stock based compensation was treated, the combined company's estimated net debt, the amounts attributable to tax-effected pension underfunding and other post-employment benefits, the amount of estimated transaction costs, the amount of capitalized joint venture income or the number of fully diluted shares of the combined company expected to be outstanding.

66.     Since information was omitted, shareholders are unable to discern the veracity of Goldman Sachs's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare Goldman Sachs's calculations with the Company's financial projections.  The absence of any single piece of the above information renders Goldman Sachs's discounted cash flow analyses incomplete and misleading.  Thus, the Company's shareholders are being materially misled regarding the value of the Company.

67.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections

and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

68.     Therefore, in order for Hexcel shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

69.     In sum, the S-4 independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the S-4 independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the S-4 to garner votes in support of the Proposed Transaction from Hexcel shareholders.

70.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

71.     Further, failure to remedy the deficient S-4 and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [S-4] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

74.     As set forth above, the S-4 omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure. 17 C.F.R. § 244.100(a).

75.     The failure to reconcile the non-GAAP financial measures included in the S-4 violates Regulation G and constitutes a violation of Section 14(a).

76.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

79.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

80.     Defendants have issued the S-4 with the intention of soliciting shareholder support

for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

81.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4 but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

82.     The Individual Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

83.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

84.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the S-4.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

85.     Hexcel is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the S-4.

86.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

87.     As a direct and proximate result of the dissemination of the false and/or misleading S-4 Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Hexcel within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Hexcel, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the S-4.

92.     In addition, as the S-4 sets forth at length, and as described herein, that the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  March 5, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr._

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017

Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
        jwilson@faruqilaw.com

*Counsel for Plaintiff*

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF**

I, David Schwartz ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Hexcel Corporation ("Hexcel") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in Hexcel securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 3rd day of March, 2020.

_____
David Schwartz

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 11/23/16 | 100 |
|  |  |  |
|  |  |  |